STATE OF CONNECTICUT *v.* ZACHARY JAY ELSON
(AC 28007)

Bishop, Harper and Dupont, Js.

198

Argued December 10, 2008—officially released August 4, 2009*

*Hubert J. Santos*, with whom were *Hope C. Seeley* and *Benjamin B. Adams*, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky III*, state's attorney, and *Warren C. Murray*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Zachary Jay Elson, appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (1) and unlawful restraint

---

* The defendant's motion for reconsideration and reargument en banc was granted by this court on September 3, 2009. Part V of this opinion has been superseded by *State* v. *Elson*, 125 Conn. App. 328, 9 A.3d 731 (2010).

in the first degree in violation of General Statutes § 53a-95 (a).[1] The trial court also found the defendant guilty of committing an offense while on pretrial release in violation of General Statutes § 53a-40b (1), as alleged in a part B information.[2] The defendant claims that (1) with regard to his assault conviction, the court improperly permitted the jury to find that his hands were dangerous instruments, (2) the court improperly admitted certain evidence, (3) the court, in its jury charge, improperly commented on his interest in the outcome of the case, improperly commented on the state's interest in protecting innocent persons from being convicted of crimes and delivered an instruction on reasonable doubt that diluted the state's burden of proof, (4) the evidence did not support the jury's verdict with regard to the assault charge and (5) the court considered improper factors at the time of sentencing. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. On September 3, 2004, the female victim was a student enrolled at Western Connecticut State University. During the late afternoon, the victim was working on a project in an empty classroom at the university's Danbury campus. The defendant, who was not a student enrolled at the university, entered the classroom, pretending to search for a lost cellular telephone. The defendant spoke with the victim about the telephone; the victim told him that she had not seen it and suggested that he speak with campus police or the maintenance staff. The defendant lingered in the classroom, inquired about the victim's project and asked if he could

---

[1] The jury returned a not guilty verdict as to one count of attempt to commit assault in the first degree.

[2] The court imposed a total effective sentence of twenty-five years imprisonment, execution suspended after twenty years, followed by five years of probation.

stay and watch her work. Also, the defendant asked the victim if she was dating anyone. The victim replied that she preferred to work alone and that she was happily married. The defendant stated that he was embarrassed and left the classroom.

Several minutes after this encounter, the defendant returned to the classroom. The defendant stated that he had forgotten to look on the floor for his telephone. The victim remained seated while she worked but soon sensed the defendant approach her. The victim turned her attention to the defendant and observed him holding a knife near her neck. The victim grabbed the knife and tried to pull it away from the defendant. In the struggle that ensued, the victim fell to the floor and attempted to crawl away. The defendant pursued the victim. He positioned her so that she was lying on her back and then positioned himself on top of her. He straddled her such that each of his knees was on either side of her body and, as the victim continued to resist, punched the victim in her face with his fist. For a brief period of time, the defendant prevented the victim from fleeing. Ultimately, the victim freed herself from the defendant and obtained assistance from others on campus.

Several days into their investigation, police detectives located and questioned the defendant. The defendant initially told the detectives that he had never been to the campus and had a spotty recollection of his activities on September 3, 2004. After being informed that a female had sustained injuries that were not life threatening on that date at the university, the defendant stated: "I don't remember why I did it. I got angry." He characterized what had occurred as "all a big mistake."

In a written statement that the defendant voluntarily provided to the detectives, he admitted that he had driven to the campus on September 3, 2004, emptied garbage from his automobile and began walking to "see

what was going on around campus." The defendant stated that earlier that day he had consumed vodka and that after walking about the campus he returned to his automobile, where it is possible that he passed out for several minutes. The defendant stated that he then entered a classroom building to use a restroom and that at that time he was "very, very drunk."

The defendant recalled entering a classroom in which he observed a young female who was working on a sketch. He intended to initiate a conversation with her and recalled speaking with her. The defendant stated that when he began to walk away from her, the tip of a knife that he carried in the pocket of his pants poked his leg. According to the defendant, he removed the knife from his pocket, and, at that moment, the female turned to him, observed the knife and began yelling. The defendant stated that "everything went from a thick haze to a fearful blur" and that he "must have reached out to try to stop her but accidentally hurt her." The defendant stated: "I remember an overpowering feeling of fear; things speeding by, and [I] punched her in her head—she had fallen, and in doing so, maybe knocked the knife out of my hand—I had to pick it up. I punched her again, and my hands were bloody, I never said a word. I think she whimpered when I had rushed to pick up the knife and ran." The defendant stated that he returned to his automobile and quickly drove away from the scene. Following the incident, the defendant traveled to a fast-food restaurant where he washed the victim's blood off his hands. He also traveled to a highway rest stop where he changed his clothing and discarded the clothing and sneakers that he had worn during the attack in a nearby wooded area.

The victim sustained numerous physical injuries. Those injuries included lacerations on the fingers of her right hand; one of her fingers required surgery to

repair a severed tendon. The victim also sustained lacerations on her chin, near her left eye and on her left arm. At the time of trial in 2006, the physical effects of those injuries were still evident in that the victim experienced a limited degree of flexibility in her surgically repaired finger and exhibited scars on her fingers, right hand, arm and face. Additional facts will be set forth as necessary.

## I

First, the defendant claims that, with regard to his assault conviction, the court improperly permitted the jury to find that his hands were dangerous instruments. We disagree.

The defendant posits that on the evidence presented at trial, it was reasonable for the jury to have found that he inflicted injury to the victim by the use of a knife and the use of his unclad hands. The defendant argues that the court's charge was ambiguous with regard to what constitutes a dangerous instrument and, consequently, that it reasonably was possible that the jury found that his hands were dangerous instruments for purposes of § 53a-59 (a) (1). The defendant also argues that as a matter of law, an unclad hand cannot constitute a dangerous instrument and that because it is impossible to determine whether the jury relied on such a legally inadequate theory of conviction, the assault conviction must be set aside. The defendant further argues that if it was legally permissible for the jury to have found that his hand was a dangerous instrument, the court improperly failed to require the jury to reach a unanimous verdict with regard to which instrument, a hand or a knife, he used to commit the crime.

The gist of the claim is that the court's instruction concerning the "dangerous instrument" element of § 53a-59 (a) (1) was unclear in that it did not draw

the jury's attention solely to evidence related to the defendant's use of a knife during the attack. "It is well settled . . . that a party may preserve for appeal a claim that an instruction . . . was . . . defective either by: (1) submitting a written request to charge covering the matter; or (2) taking an exception to the charge as given. . . . [T]he purpose of the [preservation requirement] is to alert the court to any claims of error while there is still an opportunity for correction in order to avoid the economic waste and increased court congestion caused by unnecessary retrials. . . . Thus, the essence of the preservation requirement is that *fair notice* be given to the trial court of the party's view of the governing law and of any disagreement that the party may have had with the charge actually given." (Emphasis in original; internal quotation marks omitted.) *State* v. *King*, 289 Conn. 496, 505, 958 A.2d 731 (2008); see also Practice Book § 42-16.

The defendant suggests that he preserved his claim for appellate review by means of his written request to charge. Several factors lead us to conclude otherwise. First, the defendant did not submit a requested instruction concerning § 53a-59 (a) (1) and did not request an instruction that the jury consider only evidence of his use of a knife in connection with this crime.

Second, the defendant did request an instruction for the lesser included offense of assault in the second degree in violation of General Statutes § 53a-60 (a) (3). To sustain a conviction of that crime, the state bears the burden of proving beyond a reasonable doubt that a defendant recklessly has caused serious physical injury to a victim "by means of a deadly weapon or a dangerous instrument . . . ." General Statutes § 53a-60 (a) (3). In his requested instruction concerning the dangerous instrument component of that criminal offense, the defendant requested that the court instruct the jury as follows: "The next element of this offense

is that the defendant used a dangerous instrument in causing the serious physical injury to the complainant. A 'dangerous instrument' is any instrument, article, or substance which, under the circumstances in which it was used or attempted or threatened to be used, is capable of causing death or serious physical injury to another person." This instruction concerning the dangerous instrument element closely mirrors, in relevant part, the statutory definition of "dangerous instrument;" see General Statutes § 53a-3 (7); as well as that delivered by the court in its instruction concerning assault in the first degree in violation of § 53a-59 (a) (1).[3]

---

[3] Relying on this aspect of the defendant's request to charge, his failure affirmatively to request an instruction prohibiting the jury's consideration of his hands as dangerous instruments and his failure to object to the court's instruction on this ground at trial, the state asserts that the defendant has waived this claim. "[W]aiver is the intentional relinquishment or abandonment of a known right. . . . [A] valid waiver calls into question the existence of a constitutional violation depriving the defendant of a fair trial for the purpose of [review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and it] also thwarts plain error review of a claim" pursuant to Practice Book § 60-5. (Citation omitted; internal quotation marks omitted.) *State* v. *Wells*, 111 Conn. App. 84, 88–89, 957 A.2d 557, cert. denied, 289 Conn. 958, 961 A.2d 423 (2008).

Here, we disagree that the defendant either implicitly or explicitly waived any objection to the court's instruction. The defendant did not provide the court with a requested instruction for assault in the first degree in violation of § 53a-59 (a) (1). Although the defendant, in a request to charge concerning a lesser included offense, requested an instruction defining dangerous instrument that mirrored that delivered by the court, we do not view the defendant's claim as being limited to the court's definition of that term. The defendant does not claim that the court's definition of that term was not accurate but, rather, that the court's instruction as to the assault crime did not convey to the jury that it could not find that he committed the crime solely by the use of his unclad hands. For this reason, we disagree that the defendant waived any objection to the court's instruction or, more specifically, induced or invited the court to deliver the instruction that it did. See *State* v. *Maskiell*, 100 Conn. App. 507, 515, 918 A.2d 293 (discussing doctrine of invited error as related to appellate review of claims of instructional error), cert. denied, 282 Conn. 922, 925 A.2d 1104 (2007).

Additionally, the defendant's failures to request an instruction in accordance with the language that he claims should have been used in the charge and to object to the court's charge as given do not, under the circumstances of the present case, reflect the defendant's acquiescence in the charge as

Finally, the defendant draws our attention to a portion of an instruction that he requested concerning the principle of unintended consequences. As to that doctrine, the defendant requested, in relevant part, that the court deliver the following instruction: "You have heard evidence indicating that any injuries associated with the defendant's alleged use of a dangerous instrument, to wit, a knife, were accidentally caused while the defendant attempted to reach out toward the complainant." We disagree with the defendant that this instruction, related to the principle of unintended consequences and not the dangerous instrument element of assault in the first degree, covered the subject matter of his claim of error. It cannot be said that this requested instruction afforded the court fair notice that the defendant sought an instruction concerning "dangerous instrument," which drew the jury's attention solely to the evidence that he had used a knife during the attack or that the jury could not properly find that he had committed the crime as a result of injuries caused with his unclad hands. Additionally, we observe that the defendant did not take an exception to the court's charge on this ground.

The defendant argues that if this court determines that his claim is not preserved, review under the doctrine enunciated in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), is appropriate. The defendant asserts: "The court's failure to specify the 'dangerous instrument' resulted in the jury being misled as to the correct application of the term, and this mistake diluted the state's burden of proof on an essential element of the crime charged." We will review the claim

given. It is also noteworthy that at no time during the proceeding did the defendant argue that it would have been legally proper for the jury to find that his hands constituted dangerous instruments. For all of these reasons, we are not persuaded that the defendant waived any objection to the court's charge insofar as it relates to the present claim.

under *Golding* because the record is adequate for review and the claim focuses on the court's instruction with regard to an essential element of a crime with which the defendant stands convicted. See *State* v. *DeJesus*, 260 Conn. 466, 472–73, 797 A.2d 1101 (2002) ("[a]n improper instruction on an element of an offense . . . is of constitutional dimension" [internal quotation marks omitted]).

"The principal function of a jury charge is to assist the jury in applying the law correctly to the facts which [it] might find to be established . . . . When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety . . . and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party . . . . In this inquiry we focus on the substance of the charge rather than the form of what was said not only in light of the entire charge, but also within the context of the entire trial. . . . Moreover, as to unpreserved claims of constitutional error in jury instructions, we have stated that under the third prong of *Golding*, [a] defendant may prevail . . . only if . . . it is reasonably possible that the jury was misled . . . ." (Internal quotation marks omitted.) *State* v. *Lawrence*, 282 Conn. 141, 179, 920 A.2d 236 (2007).

The defendant's claim rests on the proposition that the court's charge was ambiguous such that it is reasonably possible that the jury was led to believe that the defendant could have committed the crime solely with the use of his hands and not a knife. We conclude that it was not reasonably possible that the jury would have drawn such an interpretation from the court's charge. In instructing the jury on the elements of the crime of assault in the first degree, the court stated that one of

the elements of the crime was that the defendant caused the requisite injury by means of a dangerous instrument. The court thereafter discussed in detail this element of the crime: " 'Dangerous instrument' is . . . defined by statute as any instrument, article or substance, which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury. Therefore, the state must prove to you that any serious physical injury was caused by an instrument, article or substance that was capable of causing death or serious physical injury under the circumstances." The court's instruction mirrored, in relevant part, the statutory definition of dangerous instrument codified in § 53a-3 (7), and there is no claim that it technically was inaccurate.

The court did not discuss the evidence relevant to the dangerous instrument portion of its instruction and, thus, did not convey expressly to the jury that it would have been permissible for it to find that the crime was committed by the defendant's use of his unclad hands or that the evidentiary basis for the charge was conduct involving the defendant's use of his hands.[4]

Our review of the court's instructions concerning other elements of the crime, however, reflects that the court conveyed to the jury that the evidentiary basis of the charge, and the subject of its instruction, was the defendant's use of a knife. The court instructed the jury that the state bore the burden of proving that the defendant intended to cause serious physical injury to

[4] The court also instructed the jury with regard to several lesser included offenses, including intentional assault in the second degree in violation of § 53a-60 (a) (2), reckless assault in the second degree in violation of § 53a-60 (a) (3), reckless assault in the third degree in violation of General Statutes § 53a-61 (a) (2) and criminally negligent assault in the third degree in violation of § 53a-61 (a) (3). The court did not convey in any of these instructions that the evidentiary basis of these crimes was conduct involving the defendant's use of his unclad hands.

the victim. After delivering that instruction, the court instructed the jury with regard to the defense of intoxication as well as the principle of unintended consequences. These instructions were related directly to the charge of assault in the first degree. In instructing the jury on the principle of unintended consequences, the court stated: "You have heard evidence indicating that any injuries associated with the defendant's alleged use of a dangerous . . . instrument, *specifically, a knife,* were accidentally caused while the defendant attempted to reach out toward the complainant. An accidental injury or unintended consequence occurs when an unexpected result arises from an intended act. You may consider whether or not the defendant intended the results of his actions and, thus, whether, under the circumstances of this case, the injuries occurred accidentally or intentionally. The question of whether the injury was accidental bears directly upon the element of intent. If you do not find or credit evidence of an accident, and you find that the state has proven the required intent beyond a reasonable doubt, then the state has proven the first element. If the evidence of accident leaves you with a reasonable doubt that the defendant specifically . . . intended to injure the complainant *with the knife*—and I'll revise that to say, that the defendant specifically intended to cause serious physical injury to the complainant *with the knife,* then the state has not met its burden of proof, and the defendant must be acquitted." (Emphasis added.) Thus, in instructing the jury as to the essential element of intent to commit the assault crime, the court conveyed to the jury that the issue centered on the defendant's intent in using a knife during the attack.

When reviewing claims of instructional error, this court does not examine individual instructions in artificial isolation but in light of the charge in its entirety. Likewise, we do not examine provisions from the

court's charge in artificial isolation from the evidence presented at trial and the arguments advanced by counsel. "In reviewing a claim of error in a jury charge, [w]e must examine the issue or issues before the jury . . . and examine the charge in view of the factual posture of the case." (Internal quotation marks omitted.) *State* v. *Koslik*, 80 Conn. App. 746, 762, 837 A.2d 813, cert. denied, 268 Conn. 908, 845 A.2d 413 (2004).

The state presented evidence that the defendant inflicted numerous injuries to the victim. The evidence supported a finding that the victim sustained a laceration on her chin, a laceration on her left arm, a laceration in the area of her left eye and lacerations to her fingers. The victim underwent a surgical procedure to repair a tendon in one of her fingers, and the lacerations resulted in scars. The victim also testified that she sustained bruises as a result of falling to the floor and being punched. There also was evidence that the victim experienced a substantial degree of pain and discomfort following the attack. The evidence as to the manner in which these injuries were inflicted consisted of the victim's testimony that she grabbed for the knife when she detected the defendant holding it to her neck, that she fell to the floor while attempting to pull the knife away and that when she was on the floor, the defendant flipped her on her back, straddled her and struck her in the face with his fist. The victim also testified that she hit her head on the tiled floor of the classroom when the defendant flipped her over. The victim also testified that when the defendant was holding the knife to her neck, she could not get away from him without sustaining a laceration. The victim testified that at the time the defendant punched her, he was not holding a knife. The victim also testified that she did not remember being punched anywhere except in the area of her mouth.

During closing argument, the state focused on the defendant's use of a knife to commit the crime of assault in the first degree. For example, the prosecutor argued: "I'm making the argument that intent to cause serious physical injury can be inferred from the type of weapon that is used and the manner in which it is used. When you take a knife . . . and you put it near somebody's neck, a sharp instrument like this, and you specifically intend to do what your actions . . . are saying you're doing." The prosecutor referred to the lacerations sustained by the victim, the hand surgery undergone by the victim and the scarring caused by the lacerations. The prosecutor then stated: "[I]ntent to cause serious physical injury can be inferred from the type of weapon used [and] the manner in which it is used. When a person . . . puts a knife to the throat of another person, [his] conscious objective is to engage in such conduct. This was not an accident."

During closing argument, the defendant's attorney argued in relevant part that the defendant lacked the intent necessary for the commission of the crime. In arguing that the defendant did not intend to cause the victim's injuries, the defendant's attorney drew the jury's attention to injuries related to the defendant's use of a knife. He argued: "His Honor, I believe, will instruct you relating to . . . injuries with the knife accidentally while [the defendant] reached out toward the complainant. An accidental injury or unintended consequence occurs when an unexpected . . . result arises from an intended act." Similarly, the defendant's attorney discussed the defense of intoxication in relation to the defendant's use of a knife. Counsel stated: "One might, in analyzing the evidence, draw the inference that . . . the intoxication did affect [the defendant's] ability to form the requisite intent. Others of you might well consider that I don't even have to go there; it appears to be an accident as far as the . . .

use of the knife goes, and arriving at the same end, the lack of intent."

The court, in its charge, drew the jury's attention to the evidence of the defendant's use of a knife as a dangerous instrument. The court delivered a technically accurate instruction in defining dangerous instrument as "any instrument, article or substance, which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury." The court did not explicitly or implicitly suggest that the defendant's unclad hands could constitute dangerous instruments. Additionally, the victim's injuries mainly consisted of lacerations to her hands, face and arm. A reasonable view of the evidence strongly supported a finding that the lacerations were caused during the victim's struggle to take the knife from the defendant and that they were caused by a knife, not the defendant's hands or any other object. Consequently, the parties, in argument as to the assault charge, focused on the defendant's use of a knife during the attack. Our review of the preceeding factors reflects the state's theory of the case, namely, that the defendant intended to and did inflict serious physical injury with a knife. For all of these reasons, we conclude that it was not reasonably possible that the court's instruction led the jury to consider the defendant's hands as dangerous instruments. Accordingly, the defendant has not demonstrated that the alleged constitutional violation clearly exists and clearly deprived him of a fair trial; the claim fails under *Golding*'s third prong.[5]

[5] In light of our conclusion concerning the possible interpretation of the court's instruction, we need not and do not address the defendant's argument that it would have been legally impermissible for the jury to find that his hands were dangerous instruments. The same is true for the defendant's argument that the court improperly failed to require the jury to reach a unanimous verdict with regard to which dangerous instruments he used to commit the crime.

## II

Next, the defendant claims that the court improperly admitted into evidence a knife that the state argued that he used during the attack. We disagree.

The following procedural history is relevant to the defendant's claim. During the state's case-in-chief, the state presented evidence concerning the defendant's use of a knife during the attack. The state also presented evidence that the police discovered a knife partially concealed on the floor of the defendant's automobile, beneath the driver's seat. The state moved for the admission of the knife as well as four photographs depicting the knife. The defendant objected to the admission of this evidence on the ground that the state had not laid a sufficient foundation in the evidence to demonstrate that the knife was relevant to any issue in the case. During argument as to these exhibits, the parties and the court agreed that there was a red substance, which resembled blood, on the knife. The state had not presented any evidence concerning this substance, and the defendant argued that the admission of the knife with the substance on it would raise the risk of the jury drawing impermissible inferences from the evidence. The defendant suggested that a similar knife be shown to the jury in place of the actual knife that had been seized by the police.

The court overruled the defendant's objection to the evidence. The court stated that the knife was relevant and that the defendant's arguments to the contrary pertained to the weight of the evidence, not its admissibility. The court, however, ruled that the exhibit must be redacted in some manner, such that the jury would not be made aware of the blood-like substance on the knife. Prior to closing arguments, the prosecutor and the defendant's attorney notified the court that they had reached an agreement as to the knife and a related

exhibit, a photograph of the knife. The parties agreed to present an exact duplicate of the knife to the jury, without the substance on it, as well as a black and white photograph of the knife lying next to a ruler.[6] The length of the knife admitted into evidence was approximately twelve and one-half inches; the length of its blade was approximately seven inches. The court agreed to present the evidence to the jury in accordance with this joint stipulation.

On appeal, the defendant reiterates the claim that he raised before the court concerning the relevance of the knife. The defendant argues that the state failed to lay an adequate foundation in the evidence to demonstrate that the knife admitted into evidence, or one like it, was used in the attack. The defendant argues that the knife admitted into evidence was a large carving knife and that the victim had testified that the defendant had used a smaller steak knife during the attack. The defendant also argues that there was evidence that he had told police that during the incident he had brandished a six inch knife, which he had removed from his pocket. The defendant argues that insofar as it was not clear whether he was referring to the length of the knife or the length of its blade, this statement did not support the admissibility of the large knife that the court admitted into evidence.[7]

---

[6] The defendant, by this agreement as to the substitute exhibits, did not abandon his earlier objection to the admissibility of the knife on the ground of relevancy. The record reveals that the defendant argued that the knife, with or without the substance that adhered to it, was not relevant.

[7] In this appeal, the defendant also claims that the knife was inadmissible because its probative value was outweighed by its prejudicial effect on the jury. In this regard, the defendant argues that the knife tended unfairly to arouse the emotions of the jury. It is not clear whether this argument is based on the size of the knife or its very nature. The defendant argues: "When the trial court improperly allowed the jury to infer that the carving knife was held by the defendant in the classroom, it also invited heightened emotions, hostility toward the defendant and sympathy for the complainant." The defendant also argues that the knife, due to its large size, tended unfairly to diminish his credibility and theory of defense, which was that he had

"The applicable standard of review for evidentiary challenges is well established. We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Beavers*,

entered the classroom carrying the knife in his pocket and that he had removed it only after it had poked him in the leg.

We carefully have reviewed the transcript of the proceedings at trial for arguments of a similar nature that were raised before the trial court. The defendant's attorney, during the lengthy argument concerning the admissibility of the knife, stated: "[T]he court should have concern as to offering something susceptible to either the argument or the mistaken impression that it would otherwise leave in the eyes of the jury. And all relating to the state not taking what would be . . . the appropriate steps prior to establishing a foundation to support that argument or inference." The defendant's attorney, discussing the lack of evidence to demonstrate that the knife was used in the attack, stated: "[T]he mere presence of the knife would unfortunately create a significant chance of . . . the misdrawing of inferences by a jury." Further, in discussing what he deemed to be the "risk" associated with the admission of the knife, the defendant's attorney explained his concern solely in terms of the possibility that the jury could infer, absent any support in the record, that the substance on the knife was blood. Addressing this concern, the court ruled that the substance adhering to the knife was not admissible.

"Whenever an objection to the admission of evidence is made, counsel shall state the grounds upon which it is claimed or upon which objection is made, succinctly and in such form as he or she desires it to go upon the record, before any discussion or argument is had. . . ." Practice Book § 5-5. On appeal, "[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. . . ." Practice Book § 60-5. Our thorough review of the proceedings does not reveal that the defendant distinctly raised before the trial court the claim of prejudice that he raises in this appeal, and the court did not address such a claim in its ruling. The defendant did not characterize his claim as one of unfair prejudice but in terms of relevancy and the state's ability to argue fairly that the knife was used during the attack. "Appellate review of evidentiary rulings is ordinarily limited to the specific legal issue raised by the objection of trial counsel. . . . In other words, [o]nce an objection has been made and the grounds stated, a party is normally limited on appeal to raising the same objection on the same basis as stated at trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Trotter*, 69 Conn. App. 1, 10–11, 793 A.2d 1172, cert. denied, 260 Conn. 932, 799 A.2d 297 (2002). To consider a claim articulated for the first time on appeal would result in a trial by ambuscade of the trial judge. See *State* v. *Prioleau*, 235 Conn. 274, 311, 664 A.2d 743 (1995). We decline to review the claim of prejudice raised for the first time in this appeal and limit our consideration to the claim of evidentiary error articulated by defense counsel before the trial court.

290 Conn. 386, 396, 963 A.2d 956 (2009). This deferential standard applies to the claim before us, which does not involve a question of law but concerns the trial court's "discretion to admit or to bar the evidence based [on] relevancy, prejudice, or other legally appropriate grounds . . . ." *State* v. *Saucier*, 283 Conn. 207, 219, 926 A.2d 633 (2007); see also *State* v. *Bonner*, 290 Conn. 468, 496, 964 A.2d 73 (2009).

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." Conn. Code Evid. § 4-1. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, [as] long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Bonner*, supra, 290 Conn. 497. "The proffering party bears the burden of establishing the relevance of the offered [evidence]. Unless a proper foundation is established, the evidence is irrelevant." (Internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 838, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006).

At the time that the state offered the knife into evidence, it had presented the following evidence. The victim testified as to the manner in which the attack occurred, the lacerations she sustained during the attack and the defendant's use of a knife. She testified that she had observed the knife, describing it as a "dinner, steak-type knife with a serrated edge and a brown

handle." Upon being shown a photograph of the knife, the victim testified that the knife depicted in the photograph was similar to the knife used during the attack.

Matthew Reilly, a state police trooper, testified that the defendant's automobile had been seized by the police and taken to a police facility where he searched it. Reilly testified that he found the knife under the driver's seat of the defendant's automobile where it was partially obscured by a floor mat. Reilly described the knife as "a long serrated CUTCO brand knife, like a kitchen knife, something that . . . everybody has in their kitchen." Reilly further described the knife as having a black handle made of a plastic-like material, with a blade measuring approximately seven inches.

David Edwards, a state police detective, testified that he and another detective had located and interviewed the defendant during their investigation of the reported crime. Edwards testified that the defendant told him that he had entered the classroom with a knife in his pocket. Edwards testified: "I asked [the defendant] to describe the knife. He said it was a CUTCO knife. It was six inches long, serrated edge with a black thermal resin handle." Edwards testified that the defendant had voluntarily provided him with a handwritten statement of the events at issue. Edwards read from the statement, which was admitted into evidence. In the statement, the defendant recalled that prior to the assault, he had removed a CUTCO knife from his automobile and carried it in his pocket. The defendant recalled that during the struggle that ensued with the victim, he had dropped the knife. After the struggle his hands were bloody, and he "rushed to pick up the knife" and quickly left the scene. Edwards testified that he was unsure if the defendant's description of the knife being "six inches long" referred to the length of its blade or the total length of the knife.

The defendant's intent, the manner in which the assault occurred and the cause of the victim's injuries were material issues before the jury. The knife used by the defendant, which was integral to the assault charge, was highly relevant to the state's case because it shed light on these issues. The defendant does not dispute the foregoing but argues that the state failed to lay an adequate foundation in the evidence that the knife admitted into evidence had any connection to the crime.

The victim testified that a dinner or steak type of knife, with a serrated edge, was used by the defendant during the attack. More importantly, after being shown a photograph of the knife admitted into evidence, the victim testified that the knife admitted into evidence was similar to the one used during the attack. The jury reasonably could have inferred that as between the victim and the defendant, the defendant would have had a far greater degree of familiarity with the knife that he carried into the classroom on September 3, 2004. The defendant told the police that the knife that he carried into the classroom, in his pants pocket, was a CUTCO brand knife with a serrated edge and a black handle. The knife admitted into evidence met all three of these specific criteria.[8]

Additionally, there was evidence that the defendant went into the classroom with a knife that he had retrieved immediately beforehand from his automobile. The defendant returned to this same automobile immediately after the attack. It is reasonable to infer that the defendant, who quickly left the classroom after picking up the knife, returned to the automobile with the knife. In this regard, we are mindful that the evidence permitted a finding that the defendant took steps to

---

[8] At the time that the state sought the admission of the knife into evidence, the parties and the court were in agreement that the knife bore a CUTCO brand marking.

conceal his involvement in the attack after he drove away from the campus in his automobile. This same automobile, when searched by the police days after the incident, contained the knife. The knife was not found in a relatively inaccessible part of the automobile but was partially concealed under the driver's seat.

The description of the knife provided by both the victim and the defendant, the evidence of the defendant's activities on the day of the incident and the evidence of the location in which the knife was discovered by the police amply supported the court's determination that the knife was relevant evidence. The state, as the proponent of the evidence, needed only to demonstrate that the knife had a "tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." Conn. Code Evid. § 4-1. The state clearly met this burden.

The defendant argues that several factors should lead us to a different conclusion with regard to his claim. First, he argues that the victim described the knife as a steak type of knife and that the knife admitted into evidence was a larger carving style knife.

Second, he argues that the knife admitted into evidence was far larger than the knife that the defendant described as being six inches long. Third, the defendant argues that the significance of the fact that the knife was found by the police in his automobile is lessened by evidence that the police found other knives in his automobile and that, prior to his arrest, he had been employed by the CUTCO cutlery company. These arguments are not persuasive in an analysis of the admissibility of this evidence; they are fodder for the consideration of the finder of fact. See *Jewett* v. *Jewett*, 265 Conn. 669, 680, 830 A.2d 193 (2003) ("[t]he fact that evidence is susceptible of different explanations

or would support various inferences does not affect its admissibility, although it obviously bears upon its weight" [internal quotation marks omitted]). Accordingly, we disagree that the court's admission of the evidence reflected an abuse of its discretion.

### III

Next, the defendant claims that the court, in its jury charge, improperly commented on his interest in the outcome of the case, improperly commented on the state's interest in protecting innocent persons from being convicted of crimes and delivered an instruction on reasonable doubt that diluted the state's burden of proof. The defendant argues that when viewed in its entirety, the court's instruction misled the jury and infringed on his rights under the state and federal constitutions.[9] We disagree.

We will address each aspect of the defendant's claim in turn. The following standard of review, however, applies to all three parts of the claim: "[I]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . The test is whether the charge as a whole presents the case to the jury so that no injustice will result. . . . We will reverse a conviction only if, in the context of the whole, there is a reasonable possibility that the jury was misled in reaching its verdict. . . . A jury instruction is constitutionally adequate if it provides the jurors with a clear understanding of the elements of the crime charged, and affords them proper guidance for their determination of whether

[9] With regard to each part of this claim, the defendant has neither raised nor analyzed a claim under our state constitution. Accordingly, our review is limited to the federal constitution. See *State* v. *Higgins*, 265 Conn. 35, 39 n.9, 826 A.2d 1126 (2003) (noting that defendant's failure to brief separately claim under Connecticut constitution confines review to United States constitution).

those elements were present. . . . An instruction that fails to satisfy these requirements would violate the defendant's right to due process of law as guaranteed by the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution. . . . The test of a charge is whether it is correct in law, adapted to the issues and sufficient for the guidance of the jury. . . . The primary purpose of the charge is to assist the jury in applying the law correctly to the facts which they might find to be established. . . . The purpose of a charge is to call the attention of the members of the jury, unfamiliar with legal distinctions, to whatever is necessary and proper to guide them to a right decision in a particular case." (Citation omitted; internal quotation marks omitted.) *State* v. *Griggs*, 288 Conn. 116, 125–26, 951 A.2d 531 (2008).

## A

The first part of the defendant's claim is that the court improperly commented on his interest in the outcome of the trial.[10] During its charge, the court stated: "In this case, the defendant testified. An accused person, having taken the [witness] stand, stands before you just like any other witness. He is entitled to the same considerations and must have his testimony tested and measured by you by the same factors and standards as you would judge the testimony of any other witness. That necessarily involves a consideration of his interest in the verdict that you will render. Of course, you have no right to disregard his testimony or to disbelieve his testimony merely because he is accused of a crime. You will consider my earlier instructions on the general subject matter of credibility that obviously pertain to the defendant's testimony as well as the testimony of any other witness."

---

[10] The defendant preserved this claim for appellate review by means of a timely exception to the court's charge.

The defendant claims that the court unnecessarily highlighted the possibility that he was not being truthful and "made it reasonably possible that the jury was misled on [his] presumption of innocence . . . ." The defendant posits that the court, by this instruction, violated his right to due process.

The defendant acknowledges that our Supreme Court, in *State* v. *Williams*, 220 Conn. 385, 396–97, 599 A.2d 1053 (1991), rejected a constitutional challenge to similar instructional language. The court in *Williams*, relying on its precedent in *State* v. *Mack*, 197 Conn. 629, 500 A.2d 1303 (1985), and *State* v. *Avcollie*, 188 Conn. 626, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983), held that the trial court's reference to the defendant's interest in the outcome of the trial did not deprive him of a fair trial. *State* v. *Williams*, supra, 397. Having carefully reviewed the language at issue, the court in *Williams* reasoned: "The continual emphasis was that the jury was to evaluate the defendant's testimony in the same fashion as the testimony of the other witnesses. We have repeatedly approved the use of similar language and we do not find its use here unduly repetitive or transcending the bounds of evenhandedness." Id.

Relying on *Williams*, we reject the defendant's challenge in the present case. In its charge, the court did not unduly emphasize the defendant's interest in the outcome of the trial. The clear import of the court's instruction was that the jury was to evaluate the defendant's testimony in the same fashion as the testimony of the other witnesses who testified during the trial. This result accords with other relevant decisions of this court that have followed *Williams*. See, e.g., *State* v. *Smith*, 65 Conn. App. 126, 143–44, 782 A.2d 175 (2001), rev'd on other grounds, 262 Conn. 453, 815 A.2d 1216 (2003); *State* v. *Maia*, 48 Conn. App. 677, 688–90, 712 A.2d 956, cert. denied, 245 Conn. 918, 717 A.2d 236

(1998); *State* v. *Tyson,* 43 Conn. App. 61, 69, 682 A.2d 536, cert. denied, 239 Conn. 933, 683 A.2d 401 (1996); *State* v. *Scarpiello,* 40 Conn. App. 189, 212–15, 670 A.2d 856, cert. denied, 236 Conn. 921, 674 A.2d 1327 (1996).

In *United States* v. *Gaines,* 457 F.3d 238, 247 (2d Cir. 2006), the United States Court of Appeals for the Second Circuit expressed its "disapproval of a jury instruction highlighting a testifying defendant's deep personal interest in the outcome of a trial." The court discussed the risk that such an instruction denigrated a defendant's testimony and directed that in future cases, district courts should not deliver such an instruction to juries. Id., 249. Relying on *Gaines,* the defendant urges us to "revisit" the prior decisions of our state courts that have upheld the constitutionality of instructions concerning a testifying defendant's interest in the outcome of the trial. "In general, we look to the federal courts for guidance in resolving issues of federal law. . . . Decisions of the Second Circuit Court of Appeals, although not binding on us, are particularly persuasive." (Citations omitted.) *Turner* v. *Frowein,* 253 Conn. 312, 340–41, 752 A.2d 955 (2000). In contrast, it is axiomatic that this court, as an intermediate court of appeal, is bound by the decisions of our Supreme Court; we are not at liberty to contradict those decisions. Accordingly, insofar as *Gaines* may conflict with the Supreme Court precedent on which have relied, we decline the defendant's invitation to apply the rationale of *Gaines* to his claim.

B

The second part of the defendant's claim is that the court improperly commented on the state's interest in protecting innocent persons from being convicted of crimes, thereby diluting the state's burden of proof.[11]

___

[11] Although the defendant did not take exception to the court's instruction on this ground, we conclude that an objection raised in the defendant's written request to charge was broad enough to encompass the issue raised here. Specifically, the defendant requested therein that the court omit any

In its charge, the court stated: "The defendant justly relies upon you to consider carefully all of the evidence and to find him not guilty if the facts and the law require such a verdict. The state, as well, does not want the conviction of an innocent person. The state is as much concerned in having an innocent person acquitted as in having a guilty person convicted. At the same time, the state does look to you to uphold the law and to render a verdict of guilty if the facts and law require that verdict."

The defendant claims that the instruction tended to dilute the state's burden of proof because "it indicates that the state is only concerned with [avoiding the conviction of] an innocent person and . . . that the jury should be similarly concerned." The defendant claims that because of the instruction, it was reasonably possible that the jury was misled as to his presumption of innocence and the state's burden of proof. This claim is constitutional in nature. See, e.g., *State* v. *Schiappa*, 248 Conn. 132, 168, 728 A.2d 466 (en banc) (treating as constitutional in nature claim that trial court deprived defendant of right to fair trial by stating that reasonable doubt standard made to protect innocent), cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999).

In his brief, the defendant argues that the court's instruction is materially similar to instructions criticized by our Supreme Court in *State* v. *Schiappa*, supra, 248 Conn. 170–71, and *State* v. *Francis*, 228 Conn. 118, 136 n.19, 635 A.2d 762 (1993). In *Schiappa*, the trial court, in its charge, discussed the presumption of innocence and the state's burden of proof beyond a reasonable doubt. *State* v. *Schiappa*, supra, 170. The court then stated: "But you must keep in mind that this rule

---

instruction related to the fact that the rules of law, the presumption of innocence and the state's burden to prove its case beyond a reasonable doubt " 'are made to protect the innocent and not the guilty.' "

of law is made to protect the innocent and not the guilty." (Internal quotation marks omitted.) Id., 170–71. In *Francis*, the trial court, in its charge, stated: "But the law is made to protect society and innocent persons, and not to protect guilty ones." (Internal quotation marks omitted.) *State* v. *Francis*, supra, 134. In both appeals, our Supreme Court criticized the instruction insofar as it could be interpreted to indicate that only innocent persons should be acquitted. *State* v. *Schiappa*, supra, 171; *State* v. *Francis*, supra, 136 n.19. Nevertheless, in both appeals, our Supreme Court concluded that when the challenged instructions were viewed in light of the charge as a whole, they could not possibly have confused the jury regarding the presumption of innocence or the state's burden of proof. *State* v. *Schiappa*, supra, 171–73; *State* v. *Francis*, supra, 135–36.[12]

Initially, we observe that the instruction at issue in the present case is materially distinct from those challenged in *Schiappa* and *Francis*. Here, the court did not instruct the jury that any *rule of law* was designed to protect the innocent rather than the guilty. Instead, the court referred to the interest of *the state* in avoiding the conviction of innocent persons. It is less likely that the court's comments concerning the interest of the state, rather than the purpose of the law that governed the case and was binding on the jury, would tend to mislead the jury as to the legal principles that apply.

The challenged instruction in the present case is closer in nature to the instructions reviewed in *State* v. *Lawrence*, supra, 282 Conn. 180; *State* v. *McCarthy*, 105 Conn. App. 596, 621–25, 939 A.2d 1195, cert. denied, 286 Conn. 913, 944 A.2d 983 (2008); *State* v. *Pauling*,

---

[12] The rationale of these decisions was followed, with the same result, in *State* v. *Smith*, 275 Conn. 205, 243–45, 881 A.2d 160 (2005), *State* v. *Watson*, 251 Conn. 220, 225–28, 740 A.2d 832 (1999), and *State* v. *Delvalle*, 250 Conn. 466, 471–73, 736 A.2d 125 (1999).

102 Conn. App. 556, 573–76, 925 A.2d 1200, cert. denied, 284 Conn. 924, 933 A.2d 727 (2007); *State* v. *Marshall*, 83 Conn. App. 418, 430–31, 850 A.2d 1066, cert. denied, 271 Conn. 904, 859 A.2d 564 (2004); *State* v. *Torres*, 82 Conn. App. 823, 835–37, 847 A.2d 1022, cert. denied, 270 Conn. 909, 853 A.2d 525 (2004); *State* v. *Wilson*, 71 Conn. App. 110, 117–21, 800 A.2d 653, cert. denied, 262 Conn. 905, 810 A.2d 272 (2002); and *State* v. *Tyson*, supra, 43 Conn. App. 68. Following this precedent, we recognize the possibility that, when viewed in artificial isolation, this type of instruction is susceptible of an unacceptable interpretation. Thus, we continue to discourage the use of instructions of this type. Following this precedent, however, we likewise recognize that the instruction at issue was not delivered in isolation but in the context of a jury charge in which the court repeatedly and accurately instructed the jury with regard to the presumption of innocence and the state's burden of establishing guilt beyond a reasonable doubt. For this reason we conclude that it was not possible that the instruction misled the jury.

C

Also, the defendant claims that the court's instruction on reasonable doubt deprived him of his due process right to a fair trial because it diluted the state's burden of proof.[13] The court instructed the jury in relevant part: "The meaning of reasonable doubt can be arrived at by emphasizing the word 'reasonable.' It is not a surmise, a guess or mere conjecture. It is not a doubt suggested

[13] In his written request to charge, the defendant submitted a reasonable doubt instruction that did not include the language that he challenges in this claim. In his request, the defendant also asked the court to omit any language defining reasonable doubt as " 'a doubt which is raised by the ingenuity of counsel.' " Additionally, the defendant took exception to the court's reasonable doubt instruction after the court delivered its charge, asking the court to charge in accordance with his requested reasonable doubt instruction. Accordingly, we deem this aspect of the claim to be preserved.

by counsel which is not warranted by the evidence. It is such a doubt as, in serious affairs that concern you, you would heed; that is, such a doubt as would cause reasonable men and women to hesitate to act upon it in matters of importance. It is not hesitation springing from any feelings of pity or sympathy for the accused or any other persons who might be affected by your decision. It is, in other words, a real doubt, an honest doubt, a doubt that has its foundation in the evidence or lack of evidence. It is doubt that is honestly entertained and is reasonable in light of the evidence after a fair comparison and careful examination of the entire evidence.

"Proof beyond a reasonable doubt does not mean proof beyond all doubt. The law does not require absolute certainty on the part of the jury before it returns a verdict of guilty. The law requires that after hearing all the evidence, if there is something in the evidence or lack of evidence that leaves in the minds of the jurors, as reasonable men and women, a reasonable doubt as to the guilt of the accused, then the accused must be given the benefit of that doubt and acquitted. Proof beyond a reasonable doubt is proof that precludes every reasonable hypothesis except guilt and is inconsistent with any other rational conclusion."

The defendant argues that the court's statement that reasonable doubt "is not a doubt suggested by counsel which is not warranted by the evidence" is substantively similar to the "ingenuity of counsel" instruction that our Supreme Court criticized in *State* v. *Delvalle,* 250 Conn. 466, 473–76, 736 A.2d 125 (1999). In that decision, our Supreme Court, invoking its supervisory authority over the administration of justice, directed trial courts to refrain from delivering an instruction stating that reasonable doubt was not a doubt suggested by the ingenuity of counsel. Id., 475–76. Nonetheless, the court in *Delvalle* rejected the constitutional challenge raised

in connection with the instruction, reasoning that the language, considered in the context of the entire charge, did not "[dilute] the state's burden of proof or otherwise misle[ad] the jury in any way." (Internal quotation marks omitted.) Id., 474. Here, the defendant argues: "In this case, while 'ingenuity' was removed from the charge, there is still a legitimate concern that the instruction needlessly singles out defense counsel and calls his arguments into more question than those of the state." The claim of instructional error concerning the state's burden of proof is of constitutional magnitude. See *State* v. *Morant*, 242 Conn. 666, 686–87, 701 A.2d 1 (1997).

Both our Supreme Court and this court have held that instructions nearly identical to those challenged here are not constitutionally infirm. See, e.g., *State* v. *Betances*, 265 Conn. 493, 511, 828 A.2d 1248 (2003) ("reasonable doubt is not a doubt suggested by counsel which is not warranted by the evidence" [internal quotation marks omitted]); *State* v. *Alexander*, 95 Conn. App. 154, 160, 895 A.2d 865 ("[i]t is not a doubt suggested by counsel, which is not warranted by the evidence" [internal quotation marks omitted]), cert. denied, 280 Conn. 909, 908 A.2d 539 (2006); *State* v. *Flowers*, 85 Conn. App. 681, 699, 858 A.2d 827 (2004) ("[reasonable doubt] is not a doubt suggested by counsel which is not warranted by the evidence" [internal quotation marks omitted]), rev'd on other grounds, 278 Conn. 533, 898 A.2d 789 (2006); *State* v. *Daniels*, 83 Conn. App. 210, 224, 848 A.2d 1235 ("reasonable doubt is not a doubt suggested by counsel, which is not warranted by the evidence" [internal quotation marks omitted]), cert. denied, 270 Conn. 913, 853 A.2d 528 (2004); *State* v. *Walsh*, 67 Conn. App. 776, 795, 789 A.2d 1031 ("[reasonable doubt] is not a doubt suggested by counsel which is not warranted by the evidence" [internal quotation marks omitted]), cert. denied, 260 Conn. 906, 795 A.2d

546 (2002). In accordance with this precedent, and having examined the challenged instruction in the context of the entire charge, we conclude that it is not reasonably possible that the court's instruction misled the jury. The court accurately conveyed to the jury the state's burden of proving its case beyond a reasonable doubt and, on numerous occasions during its charge, instructed the jury that the state's burden of proof applied to each element of the crimes at issue.[14]

We disagree with each aspect of the defendant's claim and conclude that the challenged instructions, either viewed individually or as a group, did not violate the defendant's right to a fair trial.

## IV

Next, the defendant challenges the sufficiency of the evidence with regard to his conviction of assault in the first degree in violation of § 53a-59 (a) (1). The defendant first argues that the evidence did not permit a finding that the victim sustained serious physical injury as a result of his use of a dangerous instrument. The defendant also argues that the evidence did not permit a finding that he acted with the requisite mental state, an intent to cause serious physical injury. We disagree.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we

---

[14] In connection with his challenge to the court's instruction on reasonable doubt, the defendant also argues: "The majority of the reasonable doubt instruction in the present case has been upheld in recent appeals; see *State* v. *Davis*, 283 Conn. 280, 929 A.2d 278 (2007); *State* v. *Jackson*, 283 Conn. 111, 925 A.2d 1060 (2007); however, for the purposes of federal review, the defendant submits [that] those decisions were wrongly decided and that the challenged language infringes on his federal constitutional protections." Absent any distinct analysis in connection with this part of the defendant's claim, we are unable to address it.

determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . [T]he trier of fact may credit part of a witness' testimony and reject other parts." (Citation omitted; internal quotation marks omitted.) *State* v. *Millan*, 290 Conn. 816, 825, 966 A.2d 699 (2009).

We will address each part of the defendant's claim in turn. We note that at the close of the state's case-in-chief, the defendant moved for a judgment of acquittal. The defendant's motion encompassed both parts of the sufficiency of the evidence claim raised here. The court denied the defendant's motion. Thereafter, the defendant elected to testify. In accordance with the so-called "waiver rule," our evaluation of the evidence will encompass not only the evidence presented during the state's case-in-chief but the defendant's testimony as well. See *State* v. *Martin*, 285 Conn. 135, 143 n.11, 939 A.2d 524, cert. denied, 555 U.S. 859, 129 S. Ct. 133, 172 L. Ed. 2d 101, after remand, 110 Conn. App. 171, 954 A.2d 256, cert. granted on other grounds, 289 Conn. 944, 959 A.2d 1010 (2008).

A

The defendant's first argument is that the evidence did not permit a finding that the victim sustained serious physical injury as a result of his use of a dangerous instrument. Section 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person . . . by means of a . . . dangerous instrument . . . ." " 'Serious physical injury' means physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ." General Statutes § 53a-3 (4).

We begin by noting that the jury reasonably could have found that the victim sustained lacerations to her right hand as a result of the defendant's use of a knife during the incident in the classroom. The defendant acknowledged that he caused injury to the victim's little finger on that hand by his use of a knife. The defendant also acknowledged that the knife constituted a dangerous instrument.

The victim testified to the manner in which she sustained the injury to her hand. The victim also testified that her hand injuries required stitches and that with regard to her little finger, she had to undergo surgery to reconnect a lacerated tendon that had retracted. The victim stated that she was anesthetized during this surgical procedure. The victim testified that she is right-handed and that at the time of trial, more than seventeen months after the incident in the classroom, she did not have full flexibility in her finger. The victim stated that she was unable to make a fist or to straighten her finger fully. Medical records reflected that the victim sustained lacerations, measuring two centimeters in length, to the fourth and fifth digits of her right hand and that

sutures were used to close these lacerations. At trial, the victim, at the request of the prosecutor, displayed her numerous scars to the jury. In addition to identifying scars on her face and arm, the victim identified scars on her hand, which she testified were related to the lacerations she had sustained during the attack as well as the surgical procedure she underwent thereafter.

The defendant characterizes the victim's hand injury as "a cut to her little finger . . . ." He argues that the injury was not serious in nature because the state did not present expert testimony concerning the severity of the injury, its permanence or whether it caused any physical impairment. According to the defendant, the victim's testimony was insufficient to demonstrate the seriousness of the injury.

We are mindful that "[n]o bright line exists between physical injury and serious physical injury . . . ." *State v. Nival*, 42 Conn. App. 307, 309, 678 A.2d 1008 (1996). The jury heard the victim's testimony concerning the manner that the physical injury to her hand occurred as well as the dangerous instrument that the defendant used to inflict such injury. The jury also observed the scarring related to the injury. The victim also testified as to the medical treatment that she underwent to surgically repair her little finger, the impaired use of her hand as well as the scarring that resulted from the injury. It belies common sense to argue that the victim lacked firsthand knowledge about any of these matters concerning the appearance of and physical impairment to her hand. In light of the type of injury at issue, we are not convinced that expert testimony was necessary to prove this element of the crime. The evidence reasonably permitted a finding that the victim sustained an injury that had required surgical treatment, has left her with an impairment to the use of her dominant hand and has left her hand visibly scarred. Accordingly, we disagree with the defendant that the victim's testimony,

in addition to the medical records in evidence, was insufficient to demonstrate that the victim had sustained a serious physical injury to her hand.

B

The defendant next argues that the evidence did not permit a finding that he acted with the requisite mental state for the commission of the crime. Section 53a-59 (a) (1) provides that a person is guilty of assault in the first degree if he acted "[w]ith intent to cause serious physical injury to another person . . . ." Section 53a-3 (11) provides: "A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ."

Our review of the defendant's brief reflects that he invites us to view his conduct on September 3, 2004, through a very narrow lens and to draw inferences consistent with his innocence. The defendant argues that "[t]he only fact that the jury had at its disposal to infer that he intended to use the knife was the mere fact that he was holding it. . . . [I]t cannot be said that this bare fact creates an inference based in the record to sustain the verdict." The defendant states that the victim grabbed for the knife he was holding and "initiated a struggle" with him. Also, in arguing that the evidence of intent was lacking, he posits that he was "significantly inebriated" at the time of the incident.

"[I]ntent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . It is axiomatic that a factfinder may infer an intent to cause serious physical injury from circumstantial evidence such as the type of weapon used, the manner in which it was

used, the type of wound inflicted and the events leading up to and immediately following the incident." (Internal quotation marks omitted.) *State* v. *Holmes*, 75 Conn. App. 721, 740, 817 A.2d 689, cert. denied, 264 Conn. 903, 823 A.2d 1222 (2003).

We have examined all of the evidence relevant to the issue of intent; this includes the evidence of the defendant's conduct before, during and after the incident in the classroom. Considering the evidence in the light most favorable to sustaining the verdict, we conclude that the jury reasonably could have made the following findings. The defendant arrived on campus without any legitimate reason to be there. He wandered about the campus until he observed the female victim alone in a classroom. He interacted with the victim under the false premise of looking for a lost cellular telephone. The defendant wandered about the campus and entered the classroom while carrying a knife that was approximately twelve inches long. The defendant brandished the knife in close proximity to the victim after she communicated her desire to be left alone.

In the ensuing struggle, the victim attempted to take the knife away from the defendant in an obvious attempt to protect herself from harm. Immediately after the knife fell to the floor, the defendant did not cease his interaction with the victim, apologize for her injuries or otherwise attempt to diffuse the situation. Instead, the defendant proceeded to strike the victim violently, to position himself on top of her and to prevent her from fleeing the scene. The defendant thereafter fled the campus and took steps to conceal evidence tying him to the incident.

On the basis of these findings, amply supported by the evidence, the jury reasonably could have inferred that the defendant used the knife while intending to cause serious physical injury to the victim. Contrary to

the defendant's view of the evidence, there was far more evidence relevant to the issue of his intent than the mere fact that he held a knife during his encounter with the victim. The defendant's pattern of conduct toward the victim revealed a violent intent. To suggest, as does the defendant, that the evidence only supported a finding that the victim's serious physical injury was the result of an accident belies a rational view of the evidence consistent with the jury's verdict. The same is true for the defendant's assertion that the evidence reflected that the victim "initiated a struggle" with him; such assertion ignores overwhelming evidence of violence by the defendant against the victim.

Additionally, with regard to his mental state, the defendant argues that the state did not rebut his testimony that, at the time of the attack, he was "significantly inebriated" as a result of his consumption of vodka. There was ample evidence before the jury concerning the defendant's conduct on September 3, 2004. To the extent that the defendant suggests that the jury was bound to accept as true his testimony concerning his consumption of vodka on that date, as well as its effect on his mental state, the argument lacks any basis in the law. The jury, as trier of fact, was free to reject, in whole or in part, the defendant's testimony in this regard; see, e.g., *State* v. *Kerr*, 107 Conn. App. 413, 425, 945 A.2d 1004 ("[t]he trier is free to accept or reject, in whole or in part, the testimony offered by either party" [internal quotation marks omitted]), cert. denied, 287 Conn. 914, 950 A.2d 1290 (2008); and to draw reasonable inferences from the evidence concerning the defendant's mental state at the time of the commission of the crime. The defendant's trial counsel argued that evidence of the defendant's consumption of alcohol was relevant to the jury's evaluation of his mental state. During its charge, the court thoroughly instructed the jury to consider whether the defendant was under the

influence of an intoxicant at the time of the alleged assault and whether the influence of an intoxicant affected his ability to form the mental state required for the commission of the crime. As its verdict reflects, the jury found that the consumption of alcohol by the defendant, if it occurred, did not impair his ability to form the intent to commit serious physical injury. It is not argued that the jury's finding in this regard was unreasonable; we will not revisit it here.[15]

For the foregoing reasons, we reject both parts of the defendant's sufficiency of the evidence claim.

## V

Finally, the defendant claims that the court deprived him of his right to due process when it considered improper factors at the time of sentencing.[16] The defendant argues that the court improperly considered (1) the fact that he proceeded to trial rather than accepting a plea bargain offered by the state and (2) the knife that was a full exhibit at the trial. As stated in her concurring opinion, Judge Dupont would review the defendant's claim. Upon undertaking such review, Judge Dupont concludes that the defendant is not entitled to resentencing and, therefore, concurs in the result

---

[15] In a similar vein, the defendant argues that "[he] credibly offered the only insight into the actual circumstances leading up to the knife being in his hand in the classroom when he testified that he inadvertently [had] put [the knife] in his pocket while cleaning out his car in the . . . parking lot just a few hours earlier." This argument suggests a flawed view of the role of the jury and the role of this court in evaluating the evidence. Of course, it was the role of the jury, and not of the defendant, to assess the credibility of the witnesses. Further, as our analysis reflects, the defendant was neither the sole nor primary source of evidence concerning his mental state. It is axiomatic that in reviewing the sufficiency of the evidence, this court will not draw inferences from the evidence that are favorable to the defendant's version of events, but those that are consistent with the jury's verdict.

[16] Despite making reference to provisions of both the state and federal constitutions during his analysis of this claim, the defendant has not provided this court with an independent analysis of any part of his claim under the state constitution.

that I reach. As stated in his dissenting opinion, Judge Bishop would reach the defendant's claim and order resentencing. He, therefore, dissents from this part of the opinion. I decline to review this claim.

The record reveals that the defendant did not raise either part of this claim before the trial court, either at the time of sentencing or thereafter. My review of the defendant's brief reflects that he has analyzed both parts of this claim as being constitutional in nature; he argued that the court's consideration of improper factors at the time of sentencing infringed on his due process right to a fair trial and requested that this court remand the case for resentencing. In his brief, the defendant neither acknowledged nor addressed the fact that this claim was not raised before the trial court. He did not ask this court to engage in a *Golding* analysis or to engage in any extraordinary level of review of this unpreserved claim.[17] In its brief, the state, relying on the factors just mentioned, argued that the claim is not reviewable by this court. The state, explicitly arguing in the alternative, also analyzed the claim on its merits. The defendant, in his reply brief, asserted that although he did not cite or otherwise invoke the doctrine of *State v. Golding*, supra, 213 Conn. 239–40, in his main brief, he "did fully address entitlement to such relief" and that the state addressed the merits of his constitutional claim.[18] Thereafter, in his reply brief, the defendant affirmatively requested review under *Golding* and argued that such review was appropriate.[19]

---

[17] At the time of oral argument before this court, the defendant's counsel represented that he had inadvertently omitted a citation to *Golding* from the defendant's main brief; he characterized the omission as a "clerical error" that occurred during the final preparation of the brief.

[18] It is noteworthy to compare the defendant's analysis of this claim to his analysis of the claim addressed in part I of this opinion. With regard to the latter claim, the defendant acknowledged in his main brief that this court might conclude that the claim was not preserved at trial. He cited *Golding* and thereafter discussed *Golding*'s applicability to the claim raised.

[19] The defendant, also for the first time in his reply brief, asserted that review of his claim under this court's supervisory powers was appropriate.

In *State* v. *Golding*, supra, 213 Conn. 239–40, our Supreme Court "set forth four conditions that a defendant must satisfy before he may prevail, on appeal, on an unpreserved constitutional claim. Because a defendant cannot prevail under *Golding* unless he meets each of those four conditions, an appellate court is free to reject a defendant's unpreserved claim upon determining that any one of those conditions has not been satisfied." (Internal quotation marks omitted.) *State* v. *Canales*, 281 Conn. 572, 580, 916 A.2d 767 (2007).

Our Supreme Court has noted that "*Golding* is a narrow exception to the general rule that an appellate court will not entertain a claim that has not been raised in the trial court. The reason for this rule is obvious: to permit a party to raise a claim on appeal that has not been raised at trial—after it is too late for the trial court or the opposing party to address the claim— would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party. . . . Nevertheless, because constitutional claims implicate fundamental rights, it also would be unfair automatically and categorically to bar a defendant from raising a meritorious constitutional claim that warrants a new trial solely because the defendant failed to identify the violation at trial. *Golding* strikes an appropriate balance between these competing interests: the defendant may raise such a constitutional claim on appeal, and the appellate tribunal will review it, but only if the record is adequate for appellate review." Id., 580–81.

The defendant included a footnote in his reply brief in which he set forth boilerplate language discussing this court's supervisory powers but did not analyze how or why such powers should be exercised under the circumstances of this appeal. This cursory request for an extraordinary level of relief fails on several grounds. First, the request was made for the first time in the defendant's reply brief. Second, the issue has not been adequately briefed in that the defendant has done little more than assert that such powers should be exercised with regard to this claim. Reasoned analysis, rather than abstract assertions, is necessary to avoid the abandonment of issues raised in a brief. See, e.g., *State* v. *Griggs*, supra, 283 Conn. 123 n.12.

Our Supreme Court has discussed an appellant's burden when requesting review under the *Golding* doctrine. "[D]efendants who seek consideration of unpreserved constitutional claims [on appeal] bear the burden of establishing their entitlement to such review under the guidelines enumerated in *Golding*." *State* v. *Waz*, 240 Conn. 365, 371 n.11, 692 A.2d 1217 (1997). "[A] defendant may prevail on an unpreserved [constitutional] claim under [review pursuant to *Golding*] . . . or the plain error doctrine. See Practice Book § 60-5 . . . . A party is obligated, however, affirmatively to request review under these doctrines." (Citations omitted; internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 288 Conn. 53, 60, 951 A.2d 520 (2008); see also *State* v. *Ramos*, 261 Conn. 156, 171, 801 A.2d 788 (2002). It is inappropriate for an appellate court to engage in a level of review that has not been requested. *Ghant* v. *Commissioner of Correction*, 255 Conn. 1, 17, 761 A.2d 740 (2000).

Additionally, an affirmative request for review under the *Golding* doctrine must be contained in an appellant's main brief. "It is well settled that *Golding* cannot be raised for the first time by way of reply brief. See *State* v. *McKenzie-Adams*, 281 Conn. 486, 533 n.23, 915 A.2d 822 ('a party may seek to prevail on unpreserved claims . . . if the claims are constitutional in nature, under *Golding*, if the party affirmatively requests and adequately briefs his entitlement to such review in his main brief'), cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007); *Lebron* v. *Commissioner of Correction*, 274 Conn. 507, 532, 876 A.2d 1178 (2005) (declining to review constitutional claims under *Golding* because habeas petitioner had not briefed entitlement to *Golding* until he filed reply brief); *State* v. *Garvin*, 242 Conn. 296, 312, 699 A.2d 921 (1997) ('[t]he reply brief is not the proper vehicle in which to provide

this court with the basis for our review under [a *Golding*] analysis' . . . *Embalmers' Supply Co.* v. *Giannitti*, 103 Conn. App. 20, 61, 929 A.2d 729 (court will not consider request for *Golding* review raised for first time in reply brief), cert. denied, 284 Conn. 931, 934 A.2d 246 (2007)." *State* v. *Faison*, 112 Conn. App. 373, 381, 962 A.2d 860, cert. denied, 291 Conn. 903, 967 A.2d 507 (2009); see also *State* v. *Peeler*, 271 Conn. 338, 373 n.36, 857 A.2d 808 (2004) (Supreme Court "generally do[es] not consider issues raised for the first time in a reply brief" [internal quotation marks omitted]), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

Here, the defendant's main brief contains only an analysis of his claim, which is constitutional in nature. The defendant did not affirmatively request review under *Golding* or assert that his claim was not preserved for appellate review. The defendant analyzed his claim as though it were a preserved constitutional claim; he set forth the statements of the court at issue and argued that they violated his right to due process. Merely raising and analyzing a claim of constitutional magnitude, however, does not constitute an affirmative request for *Golding* review.[20] Our Supreme Court's recent decision in *In re Melody L.*, 290 Conn. 131, 962 A.2d 81 (2009), directly supports that proposition. In that case, an appellant raised and analyzed an unpreserved constitutional claim. Id., 154. Our Supreme Court

[20] I respectfully disagree with Judge Dupont's assertion that I have declined to afford *Golding* review to the defendant's unpreserved claim "because he did not mention *Golding* in his brief." Although the defendant's failure explicitly to refer to *Golding* in his main brief is an important consideration in my analysis, I have not stated that this fact alone is dispositive of the reviewability issue before us. As stated in my analysis, the defendant's main brief is devoid of any suggestion that any level of extraordinary review is necessary or requested with regard to this claim. He has not, in his main brief, provided this court with an analysis of the claim consistent with *Golding*, regardless of his failure to cite that decision by name. All of these factors lead me to conclude that the claim is not reviewable.

declined to review that claim, noting that "the respondent does not seek a review under *Golding*. Her brief makes no mention of, or request for *Golding* review." Id. I carefully have reviewed the defendant's main brief in the present case. It cannot reasonably be interpreted to contain an affirmative request for review under *Golding*. In adherence to the precedent set forth previously, the affirmative request for *Golding* review made in the defendant's reply brief does not affect my analysis. Additionally, I am not persuaded by the fact that the state, only after arguing that the claim was not reviewable, responded in its brief to the merits of the defendant's constitutional claim.[21]

In the present case, the defendant neither mentioned nor requested *Golding* review in his main brief. I decline to engage in a level of review that was requested for the first time in the defendant's reply brief. Accordingly, I decline to review the defendant's unpreserved constitutional claim.

The judgment is affirmed.

In parts I, II, III and IV of this opinion, the other judges concurred. In part V of this opinion, DUPONT, J., concurred in the result.

DUPONT, J., concurring in part. I write separately because I respectfully disagree with the majority's decision, in part V of its opinion, to decline review of the claim by the defendant, Zachary Jay Elson, that the trial court considered improper factors when sentencing him, thereby depriving him of his constitutional due process rights.

---

[21] In his reply brief, the defendant asserts that the state, in its brief, "fully responded" to the issue of his entitlement to *Golding* review. My review of the state's brief belies this assertion and reflects only that the state responded to the merits of the defendant's constitutional claim.

The majority has declined review on the ground that the claim was unpreserved at trial and that the defendant has failed affirmatively to request review pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989),[1] because he did not mention *Golding* in his brief. This court recently held in *State* v. *Wright*, 114 Conn. App. 448, 969 A.2d 827 (2009), that it was not mandatory for a defendant to cite or to mention *Golding* by name to obtain review of an unpreserved claim of a constitutional deprivation at trial. Id., 463. We stated that if a defendant provides a record adequate for review and sufficiently demonstrates, by discussion of relevant authority, that his claim is of constitutional magnitude, he has satisfied the first two prongs of *Golding* and is, therefore, entitled to review. Id., 463–64.

The defendant in the present case has supplied a record adequate for review and has demonstrated that his claim is of constitutional magnitude, as the majority acknowledges. Accordingly, I believe that his claim is reviewable and should be examined under the third and fourth prongs of *Golding* to determine whether there is sufficient merit to the defendant's claim, such that the defendant should prevail.[2]

The third prong of *Golding* asks whether "the alleged constitutional violation clearly exists and clearly

---

[1] In *State* v. *Golding*, supra, 213 Conn. 233, our Supreme Court held that "a defendant can prevail on a claim of constitutional error not preserved at trial if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40.

[2] Case law is clear that "[t]he first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail." (Internal quotation marks omitted.) *State* v. *Whitford*, 260 Conn. 610, 621, 799 A.2d 1034 (2002).

deprived the defendant of a fair trial . . . ." *State* v. *Golding*, supra, 213 Conn. 240. In his brief, the defendant claims that the court improperly sentenced him on the basis of his decision to exercise his constitutional right to a trial instead of accepting a plea bargain. As evidence for this claim, the defendant points to the following remark made by the court during the defendant's sentencing hearing: "We've all heard the defendant's apology. I don't know how sincere it is, but it is certainly unfortunate that it comes so late in the process. If the defendant had been truly apologetic, he wouldn't have put the victim through the trial. To a large extent it seems to me that the defendant's apology represents thinking of himself rather than the victim." The defendant argues that "[t]he trial court's consideration of 'put[ting] the victim through the trial' infringed on the defendant's state and federal constitutional [due process] rights, and warrants a remand from this court for resentencing."

"As a general matter, a trial court possesses, within statutorily prescribed limits, broad discretion in sentencing matters. On appeal, we will disturb a trial court's sentencing decision only if that discretion clearly has been abused. . . . In spite of that discretion, however, the [a]ugmentation of sentence based on a defendant's decision to stand on [his or her] right to put the [g]overnment to its proof rather than plead guilty is clearly improper. *United States* v. *Araujo*, 539 F.2d 287, 291-92 (2d Cir.), [cert. denied sub nom. *Rivera* v. *United States*], 429 U.S. 983, 97 S. Ct. 498, 50 L. Ed. 2d 593 (1976)." (Citation omitted; internal quotation marks omitted.) *State* v. *Kelly*, 256 Conn. 23, 80–81, 770 A.2d 908 (2001). Review of such claims "should be based on the totality of the circumstances [and] the burden of proof in such cases rests with the defendant." Id., 82. Therefore, the remark in question must be viewed in the context of the entire sentencing hearing.

The defendant's sentencing hearing commenced with the prosecutor delivering his argument in support of the state's recommendation.[3] This was followed by an impact statement from the victim. The defendant's attorney then made his argument for leniency, which was followed by testimony from a friend of the defendant's family and the defendant's father. Next, the defendant exercised his right of allocution. In apologizing to the victim, the defendant stated: "I've hurt you, I've terrified you and I've destructed your sense of security, viciously. What I did was horrible, and from the bottom of my heart I'm so sorry for what I did to you and your family. I know I probably can't make it okay right now, but I'm going to do my best. And, again, I'm just so sorry." Following the apology, the court declared that it would like to make some introductory remarks before proceeding to formal sentencing. The court stated that it would first like to address some of the factors the defendant brought out. Very shortly thereafter, the court made the aforementioned remark that is at issue.

The court then discussed the victim's testimony, asserting that it "found the victim's testimony at trial entirely credible." The court stated: "A person intends the natural consequences of his acts. . . . [The] defendant came about six inches away from killing this young woman or completely ruining her life . . . . As the state correctly points out, the victim was totally blameless. This is not a case in which the victim knew the defendant, provoked the defendant, enticed the defendant or did anything to threaten the defendant. The victim bears no part of the blame for this incident.

---

[3] The state recommended a sentence of twenty years incarceration, five years mandatory minimum, for assault in the first degree; five years incarceration, consecutive, for unlawful restraint; and ten years incarceration, suspended, but consecutive to the other two counts, with five years probation, for committing an offense while out on bond.

Despite that, the defendant threatened to rob [the victim] of the prime of her life. He threatened to rob the victim of being a wife, a mother, an adult daughter, a college educated artist or a person with some other promising career. Thus, it is fully appropriate that I take away the defendant's liberty during the prime of his life."

The court proceeded to discuss the defendant's defense of intoxication. The court stated: "Even if the defendant had drunk to an excess, there must be some deep-seated anger within the defendant that explains this act of rage and violence, which the state aptly points out appears to be part of a pattern. This, in my view, makes the defendant a dangerous person. One from whom the victim, [Western Connecticut State University] and society should be protected. . . . Furthermore, intoxication simply does not explain his statement to the police and his testimony in court that this was an accident. . . . [T]his was no accident. I do not believe the defendant's testimony that he just happened to get poked in the leg with his knife; that he just happened to pull the knife out at that time and that [the victim] just happened to turn around at that time. I believe the defendant gave a false explanation to the police, that he testified falsely in court and that he essentially obstructed justice in doing so. And this is an aggravating factor."

Next, the court stated: "The probation report recommends lengthy incarceration. Perhaps lengthy is somewhat of an unclear term, but I think I know what that means, and I agree for all the reasons I've stated. The defendant committed these crimes while he was out on bail on other felony charges. . . . A judge in Norwalk trusted the defendant and released him. The defendant abused that trust in the worst way. No judge has a crystal ball. We cannot tell for certain when we make bail decisions who will commit crimes while on bail

and who will not. We make mistakes. But if we do not punish those who do commit crimes while given a privilege of release we will not be doing all we can to deter others from abusing that privilege. By committing these crimes while out on bail, the defendant not only committed a crime against the victim but also committed a crime against the court. The defendant broke his word to the court and showed disrespect for the law. The only mitigating factor I can find in this situation is that the defendant at least admitted the bail status violations." The court subsequently issued the defendant's sentence.

I believe that in this case, the totality of the circumstances surrounding the defendant's sentencing gives no indication that the court improperly augmented the defendant's sentence on the basis of the defendant's decision to stand trial. The context of the court's remark that "[i]f the defendant had been truly apologetic, he wouldn't have put the victim through the trial," makes it clear that the court was merely expressing its doubt as to the sincerity of the defendant's apology to the victim. There is no evidence that the court considered the fact that the defendant caused the victim to endure the trial when it determined the length of his sentence. Therefore, the defendant cannot prevail on his claim because he has failed to demonstrate that the alleged constitutional violation clearly exists and clearly deprived him of a fair trial, in satisfaction of the third prong of *Golding*.[4] Because the defendant has not satisfied the third prong of *Golding*, there is no need to perform a harmless error analysis in conformance with the fourth prong of *Golding*. I agree with the majority's

---

[4] I also conclude that the defendant cannot prevail on his argument that the trial court erroneously relied during sentencing on the fact that the carving knife was the knife used to assault the victim because I agree with the majority's conclusion in part II of its opinion that the knife was admitted properly as relevant evidence.

conclusion that resentencing the defendant is not warranted and that the judgment of the trial court should be affirmed.

BISHOP, J., concurring in part and dissenting in part. I agree with the majority's well reasoned analysis and its disposition of the claims of the defendant, Zachary Jay Elson, regarding the judgment of conviction. I write separately, however, because I believe the defendant's sentencing claim raises a troubling issue warranting resentencing. With respect to the state's claim that this issue has not been adequately preserved for review, I write separately from Judge Dupont because I reach the issue by following a different analytical path.

The state claims that we should not review the defendant's sentencing claim because the issue was unpreserved[1] and he did not seek review pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), in his initial brief. I agree with Judge Dupont that the failure of a party to cite to *Golding* need not invariably prevent review of a claim that is otherwise properly briefed.[2] I

[1] Under the particular circumstances, I believe it would have been extraordinarily difficult for counsel to have attempted to preserve this issue in the trial court. Once the court, at sentencing, revealed that it had taken the defendant's exercise of his right to trial into consideration and had equated this exercise with a lack of remorse, the proverbial bell had rung. The court's comments revealed that it had already formulated its view tying together the defendant's absence of remorse with his exercise of a fundamental right. At that juncture, it is unlikely there was a reasonable avenue available to counsel to undo the court's conclusion. Additionally, for counsel to have interrupted the court's sentencing comments to object to its reference to the defendant's exercise of his right to trial and its tie-in to the factor of remorse would have run the risk of incurring the court's displeasure at the moment of sentencing. The law does not require a party to undertake a patently fruitless act.

[2] It is noteworthy that in *Johnson* v. *Commissioner of Correction*, 288 Conn. 53, 68–69, 951 A.2d 520 (2008) (*Palmer, J.*, concurring), two justices concurred in the result while writing that they would have reviewed the defendant's unpreserved constitutional claim because the state was aware of the issue and had briefed and argued it, and the defendant made all of the same arguments he would have made if he had used the talismanic term *Golding* in his brief.

also agree with Judge Harper, however, that this court is bound by our Supreme Court's holdings regarding a party's obligation affirmatively to request extraordinary review and to do so in its initial brief.[3] I would reach the issue by invoking our supervisory power over the administration of justice in resolving the present appeal.

"Appellate courts possess an inherent supervisory authority over the administration of justice. . . . The standards that [are] set under this supervisory authority are not satisfied by observance of those minimal historic safeguards for securing trial by reason which are summarized as due process of law . . . . Rather, the standards are flexible and are to be determined in the interests of justice. . . . [O]ur supervisory authority [however] is not a form of free-floating justice, untethered to legal principle. . . . [T]he integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. . . . [O]ur supervisory powers are invoked only in the rare circumstance where [the] traditional protections are inadequate to ensure the fair and just administration of the courts . . . ." (Internal quotation marks omitted.) *State* v. *Mukhtaar*, 253 Conn. 280, 290 n.11, 750 A.2d 1059 (2000); see also Practice Book §§ 60-1 and 60-2. Additionally, "[i]n certain instances, dictated by the interests of justice, we may, sua sponte, exercise our inherent supervisory power to review an unpreserved claim that has not been raised appropriately under the

[3] Although our Supreme Court has made it clear that *Golding* may not be invoked for the first time in a reply brief, the rationale behind those rulings is to prevent unfair surprise and to give the state the opportunity to respond fully to the defendant's claims. See *State* v. *Garvin*, 242 Conn. 296, 312, 699 A.2d 921 (1997); *State* v. *Rosario*, 113 Conn. App. 79, 93, 966 A.2d 249, cert. denied, 291 Conn. 912, 969 A.2d 176 (2009). In each of those cases, however, as in the present case, the defendant briefed the constitutional issue in his initial brief, and the state, properly and thoroughly, briefed both the reviewability issue and the merits of the constitutional issue, fairly putting the rationale for this line of cases into question.

*Golding* or plain error doctrines." (Internal quotation marks omitted.) *State* v. *Jones*, 281 Conn. 613, 618 n.5, 916 A.2d 17, cert. denied, 552 U.S. 868, 128 S. Ct. 164, 169 L. Ed. 2d 112 (2007).[4] I believe that the present case warrants the exercise of those powers.[5]

I begin with the elementary principle that a defendant's right to trial is among the most cherished constitutional rights. As noted by the United States Supreme Court: "Although some are prone to overlook it, an accused's right to trial by a jury of his fellow citizens when charged with a serious criminal offense is unquestionably one of his most valuable and well-established

---

[4] It is noteworthy that in *State* v. *Jones*, supra, 281 Conn. 613, our Supreme Court decided to review an unpreserved claim on the ground that "the record . . . is adequate for our review and because the defendant's claim involves a constitutional right that we have characterized, in terms of importance to an accused, as equivalent to the *right to trial itself* . . . ." (Citation omitted; emphasis added.) Id., 618 n.5.

[5] Additionally, I note that our Supreme Court has expanded the range of unpreserved constitutional claims that it is willing to review without the need to seek *Golding* review. For example, the court now holds that an unpreserved claim of prosecutorial impropriety is reviewable without regard to *Golding*. See *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004). Similarly, a claim of evidentiary insufficiency is reviewable without regard to a *Golding* analysis on the rationale that a conviction based on insufficient evidence is, itself, unconstitutional. See *State* v. *Roy*, 233 Conn. 211, 658 A.2d 566 (1995); *State* v. *Cyrta*, 107 Conn. App. 656, 659, 946 A.2d 288, cert. denied, 288 Conn. 912, 954 A.2d 185 (2008). In *Cyrta*, this court opined: "[T]he defendant's claim of evidentiary insufficiency is reviewable even if it may not have been properly preserved at trial. Unpreserved sufficiency claims are reviewable on appeal because such claims implicate a defendant's federal constitutional right not to be convicted of a crime upon insufficient proof. . . . Our Supreme Court has stated that *Jackson* v. *Virginia*, [443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)], compels the conclusion that any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of [*State* v. *Golding*, supra, 213 Conn. 239–40]. . . . Thus . . . there is no practical reason for engaging in a *Golding* analysis of a claim based on the sufficiency of the evidence . . . ." (Internal quotation marks omitted.) *State* v. *Cyrta*, supra, 659–60. The court in *Cyrta* concluded that it would review the defendant's challenge to the sufficiency of the evidence as it would any properly preserved claim. Id., 660.

safeguards in this country." *Green* v. *United States*, 356 U.S. 165, 215, 78 S. Ct. 632, 2 L. Ed. 2d 672 (1958) (Black, J., dissenting). Accordingly, it is impermissible to penalize a defendant for standing trial instead of pleading guilty. *Bordenkircher* v. *Hayes*, 434 U.S. 357, 363, 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978) ("[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort"). Because this right is a fundamental one, we must be particularly vigilant in circumstances in which the right may be in peril. One such circumstance may arise at sentencing. One court has commented: "[C]ourts must not use the sentencing power as a carrot and stick to clear congested calendars, and they must not create an appearance of such a practice." *United States* v. *Stockwell*, 472 F.2d 1186, 1187 (9th Cir.), cert. denied, 411 U.S. 948, 93 S. Ct. 1924, 36 L. Ed. 2d 409 (1973).[6] Many courts have held that it is impermissible for the court to give any weight, at sentencing, to the fact that a defendant may have exercised his right to trial. For example, the Iowa Supreme Court has concluded that "the fact a defendant has exercised the fundamental and constitutional right of requiring the state to prove at trial his guilt as charged and his right as an accused to raise defenses thereto is to be given no weight by the trial court in determining the sentence to be imposed after the defendant's guilt has been established." *State* v. *Nichols*, 247 N.W.2d 249, 255 (Iowa 1976). Similarly, the Court of Appeals of Maryland, in

---

[6] This admonition has particular applicability to a system that is almost completely reliant on the plea bargaining process for the disposition of criminal cases. The biennial report of the Connecticut judicial branch reveals that in the 2004-2005 fiscal year, the Superior Court disposed of 3323 criminal cases, only 173 (5.2 percent) by trial, and in the 2005-2006 fiscal year, there were 3049 criminal dispositions, 165 (5.4 percent) by trial. Where disposition by trial is relatively rare, it is even more important to public confidence in our judicial system, if not to due process itself, that the court not take into consideration the rare exercise of the right of a defendant to require the state to prove its case at trial.

reviewing a claim that the court may have given impermissible consideration to a defendant's exercise of his right to trial, stated: "Any doubt in this regard must be resolved in favor of the defendant. Accordingly, our part in the administration of justice requires that we find that a consideration of [the defendant's] failure to plead guilty was impermissible because a price may not be exacted nor a penalty imposed for exercising the fundamental and constitutional right of requiring the State to prove, at trial, the guilt of the petitioner as charged." *Johnson* v. *State*, 274 Md. 536, 543, 336 A.2d 113 (1975); see also *People* v. *Mosko*, 190 Mich. App. 204, 211, 475 N.W.2d 866 (1991), aff'd, 441 Mich. 496, 495 N.W.2d 534 (1992).

The record in the case at hand reveals that at sentencing, the trial court stated: "We've all heard the defendant's apology. I don't know how sincere it is, but it is certainly unfortunate that it comes so late in the process. If the defendant had been truly apologetic, he wouldn't have put the victim through the trial. To a large extent it seems to me that the defendant's apology represents thinking of himself rather than the victim."

The defendant claims that these comments reveal that the court improperly considered at sentencing his decision to go to trial and that his sentence improperly was elongated by this consideration.[7] The defendant

---

[7] The defendant was convicted of assault in the first degree and unlawful restraint in the first degree. He was found not guilty of attempt to commit assault in the first degree. He was also charged, in a part B information, with the commission of these crimes while out on bond for unrelated charges. He was sentenced on the assault conviction to a period of incarceration of twenty-five years, suspended after twenty years. On the unlawful restraint conviction he received a concurrent five year sentence. The total effective sentence of twenty-five years suspended after twenty years incarceration represented an enhancement of five years due to the part B conviction. Because Connecticut does not have sentencing guidelines and, to my knowledge, the judicial branch does not maintain comparative sentencing statistics, one can not say with any accuracy whether the substantial sentence received by the defendant is outside the norm.

points out, as well, that the court considered the decision by the defendant to go to trial as evidence that he lacked remorse for his criminal conduct. In response, the state argues that the court did not improperly consider the defendant's election to go to trial as a sentencing factor and that even if the court did so, the defendant has not meet the burden of persuasion enunciated by our Supreme Court in *State* v. *Kelly*, 256 Conn. 23, 770 A.2d 908 (2001). Simply put, the state contends that the defendant has not proven that the court elongated his sentence because he chose to go to trial.[8]

As noted by Judge Dupont, our Supreme Court, in *Kelly*, adopted a "totality of the circumstances" test. Id., 82.[9] Judge Dupont surveyed the circumstances of

[8] Except in the most outrageous case, I do not think that a defendant could ever demonstrate that the court actually lengthened a sentence because he or she elected a trial. Although decisional law is not uniform in this regard, some courts have taken the view that where the record is equivocal as to whether the sentencing court considered a defendant's decision to go to trial, the matter should be remanded for resentencing. For example, in *United States* v. *Hutchings*, 757 F.2d 11 (2d Cir.), cert. denied, 472 U.S. 1031, 105 S. Ct. 3511, 87 L. Ed. 2d 640 (1985), in which resentencing was ordered where the court commented, after trial, that the trial had been a "total waste of public funds and resources . . . there was no defense in this case. This man was clearly and unquestionably guilty, and there should have been no trial." (Internal quotation marks omitted.) Id., 13.

The Oregon Court of Appeals has taken a further step to dampen the potential for a sentencing court to impermissibly consider a defendant's exercise of his right to trial. In *State* v. *Fitzgibbon*, 114 Or. App. 581, 836 P.2d 154 (1992), the court opined: "[T]he record must affirmatively show that the court sentenced the defendant solely upon the facts of his case and his personal history, and not as punishment for his refusal to plead guilty. Id., 587. There, because the record did not affirmatively show that the trial court sentenced the defendant solely on the facts and not as a punishment for pleading not guilty, the matter was remanded for resentencing.

[9] In *Kelly* and in some of the cases cited herein, the focus was on whether the court lengthened a defendant's sentence as punishment for exercising the right to trial. Other cases focus on whether the court impermissibly took the defendant's exercise of that right into consideration at sentencing. Although these terms are often used interchangeably, I believe they represent a distinction with a difference. It would be nearly impossible to prove, except in the most blatant of circumstances, that a court actually elongated

the sentencing at issue and concluded that the defendant did not prove that his sentence was elongated because he exercised his right to trial. Respectfully, I believe there are significant differences between the circumstances the court faced in *Kelly* and those we confront here. In *Kelly*, the record reflected that the sentencing court commented that it took into consideration "whether or not there was a plea or a complete trial . . . ." (Internal quotation marks omitted.) Id., 80. On review, our Supreme Court found that the subject comment did not, by itself, demonstrate that the court elongated the defendant's sentence because he elected to go to trial. Id., 83.

In the present case, the court not only took into consideration that the defendant exercised his right to trial, but the court equated that choice with the absence of remorse. Although the teaching of *Kelly* is that we must assess all of the circumstances, no part of *Kelly* requires us to give equal weight to the factors considered by the court. Thus, as in this case, I believe that if it is apparent that the court impermissibly considered, as a factor, the defendant's exercise of a fundamental right as proof of lack of remorse, that factor alone sufficiently taints the sentencing process to warrant resentencing.

Clearly, a court may take a defendant's remorse or lack of it into consideration in imposing sentence. Our Supreme Court has stated: "Among the factors that may be considered by a court at a sentencing hearing are the defendant's demeanor and his lack of veracity and remorse as observed by the court during the course of the trial on the merits. See, e.g., *United States* v. *Grayson*, 438 U.S. 41, 47–48, 50–52, 98 S. Ct. 2610, 57 L. Ed.

a sentence for this reason. On the other hand, the trial record may often be adequate to demonstrate whether the court improperly considered the election. This particular distinction does not appear to have been a focus of the court in *Kelly*.

2d 582 (1978); *United States* v. *Rosenberg,* 806 F.2d 1169 (3d Cir. 1986), cert. denied, 481 U.S. 1070, 107 S. Ct. 2465, 95 L. Ed. 2d 873 (1987); *United States* v. *Roland,* 748 F.2d 1321, 1327 (2d Cir. 1984); *McClain* v. *United States,* 676 F.2d 915, 919 (2d Cir.), cert. denied, 459 U.S. 879, 103 S. Ct. 174, 74 L. Ed. 2d 143 (1982) . . . ." (Citation omitted.) *State* v. *Anderson,* 212 Conn. 31, 47–48, 561 A.2d 897 (1989).

Here, rather than assessing the sincerity of the defendant's remorse by reference to his demeanor as a witness or other behaviors, the court discounted his expression of remorse at sentencing on the basis of its timing, commenting that if he had been truly apologetic, the defendant would not have put the victim through a trial.[10] In doing so, I believe that the court impermissibly conflated the question of remorse with the exercise of a fundamental constitutional right. In arriving at this conclusion, I do not suggest that it is always impermissible for a court to consider, as a sentencing factor, the impact on a victim of being required to testify at trial, but, here, the court went beyond that consideration to conclude that the defendant's exercise of a fundamental constitutional right, itself, demonstrated a lack of remorse.[11] In making this determination, I believe, the

---

[10] It is noteworthy that immediately preceding the defendant's allocution, the victim made an impassioned and moving statement to the court in which she discussed how the trial had caused her and her loved ones to relive the events of the defendant's criminal behavior.

[11] To the contrary, see *People* v. *Janke,* 720 P.2d 613, 616 (Colo. App. 1986), citing with approval an earlier Colorado Appellate Court opinion holding that "any consideration of the trauma to the victims caused by their having to testify would be error in light of defendant's fundamental right to require the prosecution to prove every element of the case." *People* v. *Wilson,* 43 Colo. App. 68, 71, 599 P.2d 970 (1979). I am not insensitive to the trauma realized by victims who must often relive the experiences of criminal acts inflicted on them. To give consideration to a defendant who pleads guilty and thus saves the victim from having to testify is a hallmark of our plea bargaining system. But the coin is not exactly two-sided. In a just system, elongation of a sentence from the norm cannot be the flip side of leniency from the norm. Ensuring the integrity of such a system is no simple task.

court impermissibly tainted the sentencing process, thereby entitling the defendant to be sentenced anew.

If a defendant's election for a trial can be considered, itself, as evidence of the absence of remorse, a significant sentencing factor, it does not take a leap of logic to conclude that such a determination by a sentencing court will have a chilling effect on a defendant's exercise of this most fundamental constitutional right. In a constitutional system, that result cannot be tolerated. Accordingly, I respectfully dissent from that portion of the majority opinion concerning the sentencing claim. I would remand the matter for resentencing. In all other respects, I concur.